IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY - CAMDEN

DOUGLAS CHARLES STROBY,
                Plaintiff,

        v.

EGG HARBOR TOWNSHIP;
CHIEF OF POLICE BLAZE CATANIA; and,
PATROLMAN JEFFREY LANCASTER
Jointly, Severally, or in the Alternative,
                Defendants.

Civil Action Number
09-cv- 698 (JEI/KMW)

---

**STATEMENT OF FACTS
IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

On Behalf of Defendants
The Township of Egg Harbor
Chief of Police Blaze Catania

---

A. Michael Barker, Esquire
Barker, Scott & Gelfand
a Professional Corporation
Linwood Greene – Suite 12
210 New Road
Linwood, New Jersey 08221
(609) 601-8677
AMBarker@BarkerLawFirm.net

## IV.  STATEMENT OF MATERIAL FACTS

Pursuant to Local Civil Rule 7.2, note Comment No. 3, the statement of material facts and undisputed facts required pursuant to L. Civ. R. 56.1 for summary judgment motions is not limited by the page length requirements of L. Civ. R. 7.2(b). See EEOC v. MCI International, Inc., 829 F. Supp. 1438, 1444, n.1 (D.N.J. 1993). For this reason, the Statement of Material Facts has been removed from the Brief and separately bound.

The following are facts of this case, as found among the written record, deposition testimony, and witness statements.

1.    On September 30, 2008, the Plaintiff Douglas Stroby (hereinafter referred to as "Stroby") and the Defendant, Egg Harbor Township Police Officer Jeffrey Lancaster (hereinafter referred to as "Lancaster") were involved in a physical altercation at Stroby's home. [See, Exhibit "3" Statement of Douglas Stroby].

2.    As a result of the events on September 30, 2008, Stroby commenced this civil action on January 28, 2009, in the Superior Court of New Jersey, Law Division, Atlantic County, against Lancaster, Egg Harbor Township Chief of Police Blaze Catania (hereinafter referred to as "Chief Catania"), and Egg Harbor Township (hereinafter referred to as "EHT"). [See, Exhibit "2" Plaintiff's Complaint].

3.    By way of factual background, on or about December 12, 2002, EHT

June 1, 2010/ 10 am

Page 1 of 23
Statement of Material Facts/ Defendants' Motion for Summary Judgment
BARKER, SCOTT & GELFAND · A PROFESSIONAL CORPORATION · LINWOOD, NEW JERSEY 08221

appointed Lancaster as a patrol officer within its police department. [See, Exhibit "15" Resolution 484].

4.     As part of the hiring process, EHT conducted a full background investigation on Lancaster. [See, Exhibit "16" Background Investigation of Lancaster].

5.     In addition, Lancaster was subjected to a psychological evaluation for his fitness to be a police officer. [See, Exhibit "17" Psychological Evaluation of Lancaster].

6.     The background investigation revealed that Lancaster had been arrested on three separate occasions; however, he had never been convicted of a crime. [See, Exhibit "16" Background Investigation, at p.18; see also, Exhibits "18," "19," and "20" Police Reports regarding Prior Arrests].

7.     Two of these prior arrests occurred when Lancaster was a juvenile. [See, Exhibit "18" August 1990 Arrest Report; Exhibit "19" August 1992 Arrest Report].

8.     In 1990, Lancaster was fourteen years old when he was arrested for criminal mischief for joyriding in golf carts without permission from the owner. [See, Exhibit "18" August 1990 Arrest Report].

9.     In 1992, Lancaster was seventeen years old when he was arrested for his involvement in a fight with other teenagers on a boardwalk in Ocean City, New Jersey. [See, Exhibit "19" August 1992 Arrest Report].

June 1, 2010/ 10 am

10.    The 1990 and the 1992 charges filed against Lancaster when he was a juvenile were each subsequently dismissed upon payment of restitution. [See, Exhibit "21" Disposition of Juvenile Charges].

11.    Lancaster's only adult arrest occurred in South Carolina when he was twenty-one years old. [See, Exhibit "20" March 1997 Arrest Report & Accompanying Documentation].

12.    Lancaster and a group of friends were involved in a fight. [See, Exhibit "20" March 1997 Arrest Report & Accompanying Documentation].

13.    The original charge was simple assault; however, it was upgraded to Lynching 2nd Degree. [See, Exhibit "20" March 1997 Arrest Report & Accompanying Documentation].

14.    Not to be confused with what has become the general understanding of the phrase "lynching," the charge as used by the State of South Carolina has nothing to do with race and is defined as:

> "any act of violence inflicted by a mob upon the body of another person and from which death does not result shall constitute the crime of lynching in the second degree and shall be a felony." [See, Exhibit "22" South Carolina Statute re: Lynching].

15.    The South Carolina charges against Lancaster were dismissed on November 26, 1997, on the condition that $500.00 in restitution be paid to the victim. [See, Exhibit "20" March 1997 Arrest Report & Accompanying Documentation at EHT/000566].

16.    Lancaster was never indicted on the charges issued in South

June 1, 2010/ 10 am

Carolina, and there was no requirement that he enter into any diversionary program equivalent to New Jersey's Pre-Trial Intervention Program. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T64-25 through T67-2].

17.   Since these three prior arrests, two of which occurred when Lancaster was a juvenile, did not result in any indictments or convictions and the remainder of Lancaster's background check was unremarkable, Lancaster was permitted to move along in the EHT hiring process. [See, Exhibit "16" Background Investigation of Lancaster; Exhibit "15" Resolution Hiring Lancaster].

18.   Lancaster was interviewed by a six-member panel of EHT, including Mayor McCullough, Committeeman Frank Sutton, Committeeman Stanley Glassey, Committeeman Bob Reed, Police Chief John Coyle, and Business Administrator Peter Miller, all of whom recommended Lancaster for hire. [See, Exhibit "24" Applicant Interview Evaluation].

19.   Lancaster was ultimately offered employment on November 21, 2002. [See, Exhibit "25" Offer of Employment].

20.   A psychological evaluation determined that Lancaster was fit for police work with a low risk for future performance difficulty. [See, Exhibit "17" Psychological Evaluation,].

21.   Although Lancaster was appointed as an EHT officer on December

June 1, 2010/ 10 am

Page 4 of 23
Statement of Material Facts/ Defendants' Motion for Summary Judgment
BARKER, SCOTT & GELFAND · A PROFESSIONAL CORPORATION · LINWOOD, NEW JERSEY 08221

12, 2002, Lancaster had to first attend the police academy prior to being fully certified, which he completed in 2003. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T20-2 through T20-5].

22.    From 2003 through the date of the incident with Stroby on September 30, 2008, Lancaster demonstrated continuous improvement and received positive evaluations. [See, Exhibit "26" Multiple Performance Evaluations of Lancaster].

23.    In fact, the record demonstrates that, up until September 30, 2008, Lancaster had been disciplined only once in the six years he had been employed by EHT. [See, Exhibit "27" Disciplinary Action Notice].

24.    On September 26, 2008, Lancaster received a written reprimand for allowing his driver's license to expire and for not cleaning his gun properly. [See, Exhibit "27" Disciplinary Action Notice].

25.    Four days later, without any warning, Lancaster and Stroby were involved in a physical confrontation at Stroby's home. [See, Exhibit "3" Statement of Stroby].

26.    The altercation involved the most personal matter of infidelity in marriage. [See, Exhibit "3" Statement of Douglas Stroby, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T54-4 through T54-7].

27.    Prior to September 30, 2008, Stroby had known Lancaster approximately 20 years, considered him an acquaintance with whom he shared

mutual friends, and with whom he socialized occasionally. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T24-3 through T26-10].

28.   Stroby was employed by EHT as a dispatcher before and during part of Lancaster's employment as an officer. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T24-7 through T24-10].

29.   Stroby testified at deposition that he and Lancaster were friendly at work, and that he never had any problems with Lancaster. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T25-16 through T27-17].

30.   Stroby testified at his deposition that from late-February 2008 through late-May 2008, he was in Oklahoma training to be an FAA air traffic controller. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T28-11 through T28-16].

31.   Stroby testified at deposition that while he was away, Stroby noticed, on his electronic cell phone bill, that there were text messages sent back and forth between his wife, Samantha, and Lancaster. [See, Exhibit "3" Statement of Douglas Stroby, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T28-19 through T28-24].

32.   Samantha and Lancaster had a dating relationship before Samantha and Stroby were married. [See, Exhibit "3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T29-5 through T29-11].

33.   Stroby testified at his deposition that because of this prior

June 1, 2010/ 10 am

Page 6 of 23
Statement of Material Facts/ Defendants' Motion for Summary Judgment
BARKER, SCOTT & GELFAND · A PROFESSIONAL CORPORATION · LINWOOD, NEW JERSEY 08221

relationship, he questioned Samantha regarding the text messages. [See, Exhibit "3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T29-12 through T30-9].

34.    According to the deposition of Stroby, he first confronted Samantha before September 30, 2008 and Samantha repeatedly denied any romantic involvement with Lancaster. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T29-5 through T30-9; T33-2 through T34-8].

35.    Stroby testified at deposition that he never fully believed this and continued to periodically press Samantha on this issue. [See, Exhibit "3" Statement of Douglas Stroby, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T29-16 through T30-9].

36.    Finally on September 30, 2008, at approximately 2 o'clock p.m., Samantha admitted that she had a "one-night stand with Jeff [Lancaster]" while Stroby was away. [See, Exhibit "3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T30-10 through T30-15].

37.    Stroby testified at deposition that he and Samantha agreed that Samantha would leave the house. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T34-9 through T34-13].

38.    After hearing the confession, and mutually deciding that Samantha would leave the house, Stroby testified at deposition that he left his home and went for a drive to "cool down" while Samantha collected her belongings and to

determine how he was going to tell their children about the situation. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T34-25 through T35-24].

39.    During his drive, Stroby realized he was near Lancaster's home, which according to Stroby's testimony, was only approximately two miles from the Stroby home. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T36-10 through T36-16].

40.    Stroby knew where Lancaster lived having been there on a previous occasion to help Lancaster paint. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T37-11 through T38-6].

41.    Once Stroby realized he was "pretty much ... driving past Jeff's [Lancaster] house" he decided he would go there and see if Lancaster was home so he could ask him why he did this. [See, Exhibit "3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T36-6 through T36-16].

42.    When Stroby arrived at Lancaster's home, he first spoke with Jeff's father-in-law, who informed Stroby that Lancaster was not home. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T39-19 through T39-22].

43.    While Stroby was speaking to Jeff's father-in-law, Jeff's wife, Stephanie came to the door. [See, Exhibit "3" Statement of Stroby; Exhibit "5"

June 1, 2010/ 10 am

Page 8 of 23
Statement of Material Facts/ Defendants' Motion for Summary Judgment
BARKER, SCOTT & GELFAND · A PROFESSIONAL CORPORATION · LINWOOD, NEW JERSEY 08221

Certified Deposition Transcript of Douglas Stroby at T39-22 through T39-24].

44.   Stroby asked Stephanie to step outside and speak with him. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T39-24 through T40-5].

45.   Once Stroby verified that Stephanie knew who he was, he told her "Sam had just admitted to [him] that she and Jeff slept together". [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T40-5 through T40-8].

46.   Although he had originally gone to Lancaster's home specifically to speak with Lancaster, upon being told that Lancaster was not home, Stroby "felt it necessary to tell [Stephanie] that Jeff and Sam had sex because if the roles were reversed [he] would want to know." [See, Exhibit "3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T38-12 through T38-17].

47.   Stroby testified at deposition that Stephanie became upset. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T40-9 through T40-13].

48.   Stroby apologized to Stephanie for "telling her ... for being in a part of it and upsetting her. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T40-14 through T40-20].

49.   After a brief conversation, Stroby told Stephanie he would speak to Lancaster after he [Lancaster] was through working for the day. [See, Exhibit

"5" Certified Deposition Transcript of Douglas Stroby at T41-4 through T41-6].

50.   Stroby then left the Lancaster residence. [See, Exhibit "3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T41-17 through T41-20].

51.   Stroby testified at deposition that, after speaking with Stephanie, he returned home where Samantha was still packing her things. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T45-13 through T45-23].

52.   Stroby and Samantha spoke for another 10 to 15 minutes about Samantha's admission of infidelity with Lancaster. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T45-24 through T46-12].

53.   Stroby testified that it was during this conversation that he first noticed an EHT police car outside of his home. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T46-13 through T46-24].

54.   According to the deposition testimony of Lancaster, on September 30, 2008, he had been assigned to the Department of Motor Vehicles (DMV) for the second part of his 8:00 a.m. to 4:00 p.m. shift, from approximately Noon or 1:00 p.m. until 4:00 p.m. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T29-7 through T31-12].

55.   Lancaster testified at his deposition that his normal procedure is when the officer who relieves him signs on the radio that he is en route, Lancaster leaves the DMV. [See, Exhibit "23" Certified Deposition Transcript of

June 1, 2010/ 10 am

Page 10 of 23
Statement of Material Facts/ Defendants' Motion for Summary Judgment
BARKER, SCOTT & GELFAND · A PROFESSIONAL CORPORATION · LINWOOD, NEW JERSEY 08221

Jeffrey Lancaster at T39-8 through T39-12].

56.   This usually occurs at approximately 3:10 p.m. or 3:15 p.m. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T39-13 through T40-1].

57.   Lancaster testified at his deposition that, on September 30, 2008, he followed his usual procedure and left the DMV when the officer who was relieving him signed on the radio that he was en route to the DMV. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T39-13 through T40-4].

58.   Lancaster left the DMV and went on a personal errand to the bank. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T40-10 through T41-1].

59.   Lancaster testified that he did not sign out to go on this personal errand. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T41-8 through T41-9].

60.   He did not notify dispatch that he was going to the bank. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T42-3 through T42-5].

61.   After leaving the bank, Lancaster was on his way back to the EHT police department when he received a cell phone call from his wife, Stephanie. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T42-21

through T43-7].

62.   Lancaster testified that, during this phone call, Stephanie informed him that Stroby had just left their house and told her about Lancaster's affair with Samantha and that he was looking to talk to Lancaster about it. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T44-15 through T44-20].

63.   Immediately after the one to two minute phone call from his wife, Lancaster drove to Stroby's home at 33 Marsh Road in EHT in order to speak with Stroby. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T44-21 through T45-10].

64.   Lancaster testified that he did not tell his supervisors or anyone at the EHT police department that he was going to Stroby's house on September 30, 2008. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T45-20 through T46-3].

65.   Likewise, Stroby testified at his deposition that he had no facts to support an allegation that anyone within the EHT police department knew that Lancaster was going to the Stroby home on September 30, 2008. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T106-10 through T106-24].

66.   In fact, Stroby testified that, as far as he knew, the only reason Lancaster came to his house on September 30, 2008, was to address this very

June 1, 2010/ 10 am

Page 12 of 23
Statement of Material Facts/ Defendants' Motion for Summary Judgment
BARKER, SCOTT & GELFAND · A PROFESSIONAL CORPORATION · LINWOOD, NEW JERSEY 08221

personal issue between their respective families. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T105-3 through T105-7].

67.   Lancaster testified at deposition that when he arrived at Stroby's home he parked directly in front of the house. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T47-1 through T47-3].

68.   Stroby testified at deposition that he was in the midst of a conversation with Samantha about the details of her affair with Lancaster when he [Stroby] first saw an EHT police car in front of his house. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T46-13 through T46-19].

69. Stroby asserts that at first he did not see anyone; however, within seconds of seeing the patrol car Stroby saw Lancaster walking up the walkway toward the front door. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T46-25 through T47-24].

70.   Stroby testified that upon seeing Lancaster, he swung the screen door open and said, "well, look who it is." [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T48-4 through T48-10].

71.   According to the deposition testimony of Stroby, Lancaster never stopped walking toward him. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T48-21 through T48-24].

72.   Once Stroby swung open the screen door, Lancaster walked into the house. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at

T48-23 through T48-24].

73.   According to Stroby's deposition testimony, his written statement to EHT internal affairs, and his verbal statement to internal affairs, Lancaster's first words were that [Stroby's] business with his wife had nothing to do with [Lancaster] and his wife. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T49-4 through T49-6; Exhibit "3" Statement of Stroby; Exhibit "7" Internal Affairs Statement of Stroby].

74.   Lancaster's deposition testimony mirrors Stroby's on this account. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T54-5 through T54-8].

75.   Stroby responded to this comment by stating that as far as he was concerned, "[Lancaster] screwing his wife was now his business." [See, Exhibit "3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T49-3 through T49-11; Exhibit "28" Interview of Douglas Stroby at T3-12 through T3-15].

76.   Stroby testified at deposition that there was a lot of yelling, which included Stroby questioning why Lancaster chose to handle this personal dispute while he [Lancaster] was on duty. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T49-15 through T49-22 and T51-18 through T52-1].

77.   Even before Lancaster mentioned his or Stroby's wife, Stroby asserts

he knew that Lancaster was at his home to discuss what Stroby had revealed to Lancaster's wife earlier in the day. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T53-4 through T55-9].

78.    Thereafter, according the deposition of Stroby, Lancaster punched him in the bottom right lip. [See, Exhibit "3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T56-1 through T56-25].

79.    Stroby testified that he responded to this punch by punching Lancaster "right back." [See, Exhibit "3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T57-1 through T57-2].

80.    Lancaster testified at his deposition that it was Stroby who punched him first. [See, Exhibit "23" Certified Deposition Transcript of Jeffrey Lancaster at T54-10 through T54-19].

81.    It is undisputed that a physical altercation between Lancaster and Stroby erupted at Stroby's home after Stroby informed Lancaster's wife, Stephanie, that Lancaster had slept with Stroby's wife, Samantha. [See, Exhibit "3" Statement of Douglas Stroby].

82.    After a brief struggle, the two men were at a stalemate at which time Stroby told Lancaster to get out of his house. [See, Exhibit "3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T57-8 through T58-2; Exhibit "23" Certified Deposition Transcript of Jeffery

June 1, 2010/ 10 am

Lancaster at T56-23 through T57-2].

83.   Lancaster did leave, but he returned because he picked up the wrong sunglasses. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T58-3 through T60-4).

84.   Stroby told Lancaster over and over to stay outside and that he [Stroby] would retrieve Lancaster's sunglasses; however, Lancaster entered the Stroby home and retrieved his glasses on his own. [See, Exhibit "3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T58-3 through T60-4].

85.   Within two minutes of Lancaster leaving the residence, Stroby contacted the Egg Harbor Police Department. [See, Exhibit "3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T61-1 through T61-6].

86.   Stroby testified at deposition that he called the EHT police department because he was worried about what version of events Lancaster would say happened. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T61-17].

87.   In order to have his version of events documented, Stroby called the EHT police department. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T61-17 through T61-25; T65-13 through T66-11].

88.   Stroby was transferred to Sergeant Marc Romantino and Stroby

informed Sergeant Marc Romantino what happened. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T61-21 through T61-25].

89.    Sergeant Romantino wanted Stroby to come to the Egg Harbor Township Police Department to file the complaint. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T63-5 through T63-20].

90.    Stroby provided a signed statement of the events. [See, Exhibit 3" Statement of Douglas Stroby; Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T71-15 through T75-1].

91. Stroby never told Sergeant Romantino or anyone that he wanted to file criminal charges against Lancaster. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T64-3 through T64-9].

92.    Stroby testified at deposition that he never had any intention of filing criminal charges against Lancaster and at no time did he ever make an attempt to file a criminal complaint against Lancaster. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T64-3 through T67-1; Exhibit "29" 9/30/08 memorandum from Lt. Townsend to Chief Catania regarding the incident at 33 Marsh Road, EHT).

93.    Stroby went to the EHT Police Department at approximately 5:00 p.m. on September 30, 2008. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T67-2 through T67-14].

94.    Stroby provided a statement of his version of events to Lt. Townsend.

June 1, 2010/ 10 am

Page 17 of 23
Statement of Material Facts/ Defendants' Motion for Summary Judgment
BARKER, SCOTT & GELFAND · A PROFESSIONAL CORPORATION · LINWOOD, NEW JERSEY 08221

[See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T69-2 through T70-3].

95.   Stroby was photographed to document any injury. [See, Exhibit "5" Certified Deposition Transcript of Douglas Stroby at T70-16 through T70-22].

96.   An internal affairs investigation was immediately commenced. [See, Exhibit "30" Internal Affairs Complaint].

97.   After Stroby left the EHT police on September 30, 2008, he received a telephone call at home from Lieutenant Townsend, who at the orders of Chief Catania, asked that Stroby write out his version of events. [See, Exhibit "3" Statement of Stroby; Exhibit "5" Certified Deposition Transcript of Stroby at T71-15 through T72-1].

98. Lieutenant Townsend gave Stroby the cell phone number of another lieutenant who would pick up the statement the next day. [See, Exhibit "3" Statement of Stroby; Exhibit "5" Certified Deposition Transcript of Stroby at T71-15 through T72-1].

99.   Stroby called the EHT police department the following day to inform someone that he had finished the statement as requested by Chief Catania. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T73-21 through T74-20].

100. Subsequently, Officer Weldon came personally to Stroby's home and picked up the statement. [See, Exhibit "5" Certified Deposition Transcript of

Stroby at T73-21 through T74-20].

101. On or about October 7, 2008, Stroby provided a tape recorded statement of his version of events at the request of the EHT police department as part of the internal affairs investigation. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T75-6 through T76-25; Exhibit "28" Internal Affairs Interview of Stroby].

102. Stroby testified at his deposition that he was originally concerned that no investigation was being completed because he had not received a letter from Chief Catania. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T77-18 through T78-2].

103. Stroby did receive a letter notifying him of the IA, but due to a clerical error, the use of Stroby's old home address, the letter from Chief Catania was delayed a day or two. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T79-12 through T82-11].

104. Based on Stroby's complaint and upon completion of the investigation which included a recorded statement of not only Stroby, but that of Lancaster and Samantha, the EHT police department, through Chief Catania, administratively charged Lancaster with conduct unbecoming an officer (simple assault), leaving an assigned post, and violation of the chain of command. [See, Exhibit "6" 10/20/08 Internal Affairs Disposition Recommendation].

105. Lancaster had the option to plead not guilty and challenge the

June 1, 2010/ 10 am

Page 19 of 23
Statement of Material Facts/ Defendants' Motion for Summary Judgment
BARKER, SCOTT & GELFAND · A PROFESSIONAL CORPORATION · LINWOOD, NEW JERSEY 08221

charges at a formal administrative hearing or plead guilty. [See, Exhibit "6" 10/20/08 Internal Affairs Disposition Recommendation].

106. If Officer Lancaster pled not guilty to the charges and the hearing officer subsequently found him guilty, he faced termination from the EHT police department. [See, Exhibit "6" 10/20/08 Internal Affairs Disposition Recommendation].

107. If he pled guilty, Officer Lancaster faced suspension without pay. [See, Exhibit "6" 10/20/08 Internal Affairs Disposition Recommendation].

108. Lancaster pled guilty to the departmental charges and in so doing wrote to Chief Catania "I have no intent to request a hearing, as my guilt is self-evident." [See, Exhibit "31" 10/20/08 Memo from Lancaster to Chief Catania].

109. In a separate memo to the Chief, Lancaster wrote, "I used poor judgment when I made a decision to handle a personal matter while on duty and in uniform." [See, Exhibit "32" 10/15/08 Memo from Lancaster to Catania].

110. In pleading guilty to the charges as filed, Lancaster was suspended for forty-five (45) days total without pay including the forfeiture of fifteen (15) vacation days. [See, Exhibit "8" 10/29/08 Memo from Chief Catania to EHT CFO with regard to Lancaster's suspension].

111. In addition, Officer Lancaster was stripped of his position on the EHT Emergency Response Team and ordered to undergo anger management. [See, Exhibit "8" 10/29/08 Memo from Chief Catania to EHT CFO with regard to

June 1, 2010/ 10 am

Page 20 of 23
Statement of Material Facts/ Defendants' Motion for Summary Judgment
BARKER, SCOTT & GELFAND · A PROFESSIONAL CORPORATION · LINWOOD, NEW JERSEY 08221

Lancaster's suspension].

112. Chief Catania permitted Lancaster's forfeiture of vacation days in lieu of being physically suspended in light of the fact that prior to this incident with Stroby, Lancaster had never received any major discipline and he had consistently received favorable evaluations in the six years he had served as an officer. [See, Exhibit "26" Various Performance Evaluations; Exhibit "27" List of Lancaster Disciplinary Actions; Exhibit "33" Certified Deposition Transcript of Chief Catania at T86-20 through T88-21].

113. Stroby testified at deposition that he had no facts to support the allegation that the investigation of the EHT police department of Lancaster for this event was incomplete. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T87-16 through T87-20].

114. Stroby testified at his deposition that he never filed any criminal charges against Officer Lancaster. [See, Exhibit "5" at T64-7 through T64-9; Exhibit "7" Internal Affairs Interview of Stroby at T10-16 through T11-6.

115. Moreover, it is undisputed that the Atlantic County Prosecutor's Office declined to commence criminal charges against Lancaster. [See, Exhibit "35" 10/6/08 Letter from ACPO to Chief Catania referring back the Complaint of Douglas Stroby].

116. Stroby testified at deposition, that although he wished Lancaster had been fired, he had no facts to support an allegation that Lancaster had received

June 1, 2010/ 10 am

lenient treatment. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T94-24 through T94-25].

117. Stroby further testified at deposition that he had no facts to support an allegation that EHT inadequately screened Lancaster prior to being hired. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T103-25 through T104-3].

118. Stroby further testified at deposition that he has no facts to support an allegation EHT has ever had an officer commit a similar offense as Lancaster did on September 30, 2008. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T104-9 through T104-18].

119. Stroby testified at deposition that he had no facts to support the allegation that EHT failed to adequately train or supervise Lancaster as a police officer. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T104-19 through T105-2].

120. Lancaster acknowledged receipt and understanding of the Rules and Regulations of the EHT PD. [See, Exhibit "34" Receipts for Personnel Polices and Procedures Manual accepted by Lancaster and the Police Manual Rules and Regulations].

121. Stroby testified at his deposition that the only reason he named Chief Catania as a Defendant in this lawsuit is because he is the Chief of Police and because Stroby's personal opinion was that Chief Catania should have fired

Lancaster. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T105-8 through T105-24].

122.   Stroby testified that he has no facts to support an allegation that Chief Catania or anyone in the police department knew Lancaster was leaving his assigned post to go to Stroby's home. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T106-10 through T106-19].

123.   Stroby testified that he had no facts to support an allegation that Chief Catania had any role in the hiring of Lancaster. [See, Exhibit "5" Certified Deposition Transcript of Stroby at T106-25 through T107-3].

June 1, 2010/ 10 am

Page 23 of 23
Statement of Material Facts/ Defendants' Motion for Summary Judgment
BARKER, SCOTT & GELFAND · A PROFESSIONAL CORPORATION · LINWOOD, NEW JERSEY 08221